**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Teresa Ward, | No. CV-20-0076-TUC-BGM |
| Plaintiff, | |
| v. | **ORDER** |
| Pima Animal Care Center Officer Hinte, *et al.*, | |
| Defendants. | |

Currently pending before the Court is Defendants' Motion to Dismiss (Doc. 11). Plaintiff has filed her response. Pl.'s Response to Defs.' Mot. to Dismiss (Doc. 20). Defendants have filed their reply in support of their motion to dismiss. Defs.' Reply in Support to Mot. To Dismiss (Doc. 23).

On May 5, 2021, oral argument was heard by the Court and the matter taken under advisement. Minute Entry 5/5/2021 (Doc. 27). On May 6, 2021, Defendants Hinte and Sanders filed their Notice withdrawing their argument that Plaintiff failed to adequately allege that Defendants personally participated in the allegedly unreasonable search. Defs.' Not. of Argument Withdrawal (Doc. 26).

**I.     FACTUAL BACKGROUND**

   *A.     Incidents Prior to Search*

On June 6, 2018, Plaintiff Teresa Ward reported harassment by her neighbor to the

Pima County Sheriff's Department ("PCSD"). FAC[1] (Doc. 10) at ¶ 10. Ms. Ward alleges that because she reported her neighbor for harassment, the neighbor called Pima Animal Care Center ("PACC") and "falsely report[ed] Ms. Ward for having over thirty dogs in her residence and dog feces all over her yard." *Id*. at ¶ 11. On that same day, Deputy Pitts[2] examined Ms. Ward's residence and backyard and did not find thirty dogs. *Id.* at ¶ 12.

Two days later, an investigator from PACC went to Ms. Ward's home to investigate the neighbor's claim of thirty dogs and poor conditions. *Id.* at ¶ 14. Again, "there were not thirty dogs at Ms. Ward's residence." *Id.* at ¶ 15. Additionally, the investigator walked the backyard and "did not see or smell any odors that indicated excessive feces and/or poor living conditions." *Id.* at ¶ 16.

On July 16, 2018, another "unknown PACC Officer' went to Ms. Ward's residence to investigate the "false claims" about the number of dogs. FAC (Doc. 10) at ¶ 17. After the PACC Officer's visit, Ms. Ward called the PACC supervisor about the purpose of the Officer's visit; the supervisor claimed that the Officer visited Ms. Ward's residence because they "could smell feces coming from inside her house." *Id.* at ¶¶ 19–20. Ms. Ward alleges that the PACC investigator who arrived that day did not mention the odor of feces and that the investigator had indicated that "she was there to verify the number of dogs present." *Id.* at ¶ 21. Finally, Ms. Ward alleges that when she asked the PACC supervisor, Foster, as to why PACC was harassing her by investigating "claims that had already been proven false," Supervisor Foster hung up on her. *Id.* at ¶ 22.

A few days later, Ms. Ward reported "the condition of her neighbor's animals" to the Pima County Sheriff's Office. *Id.* at ¶¶ 23–25. Sheriff's deputies and PACC personnel arrived at the scene to investigate Ms. Ward's complaints. *Id.* at ¶ 26. The PACC investigator then went to Ms. Ward's home and asked to search the home. FAC

---

[1] First Amended Complaint

[2] The named Defendants in the complaint are Officers Hinte, Sanders, and Moore. Deputy Pits and other individuals are not named as Defendants.

(Doc. 10) at ¶ 27. Ms. Ward asked for identification, but the investigator declined and left the premises. *Id.* at ¶ 28.

On July 24, 2018, Deputy Gonzales and an investigator from PACC went to Ms. Ward's house without a warrant and asked to search the house. *Id.* at ¶¶ 29–30. Ms. Ward did not consent to a search. *Id.* at ¶ 31. While at the property, Ms. Ward asked the Deputy and the investigator "if they smelled any odors related to her dogs." *Id.* at ¶ 33. Ms. Ward alleges that Deputy Gonzales indicated that he did not. *Id.* at ¶ 35. Similarly, when asked if he had probable cause to search her home, Deputy Gonzales indicated that he did not have probable cause. FAC (Doc. 10) at ¶¶ 34–35. Ms. Ward alleges that Deputy Gonzales informed the investigator that the case should be closed because there was no probable cause. *Id.* at ¶ 38.

### B.   The Search Warrant

On July 26, 2018, a judicial officer issued a search warrant for Ms. Ward's residence.[3]  Defs.' Mot. to Dismiss (Doc. 11), Exh. "1"; *see also Pima County v. Ward*, No. SW18-000180-SW, A18-233882 (Pima Co. Justice Ct. July 26, 2018).  The search warrant indicated that there was probable cause to search Ms. Ward's "residence, detached building or structures, and curtilage on property" for any evidence "which tends to show . . . animal neglect and/or cruelty as defined by Pima County Municipal Code 6.04.110[.]"  Defs.' Mot. to Dismiss (Doc. 11) at 5–6.[4]  The search warrant authorized law enforcement to retain "[a]ny animals (living, dead, or unborn, both above and below

---

[3] "The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). "A court may take judicial notice of 'matters of public record' . . . [b]ut a court may not take judicial notice of a fact that is 'subject to reasonable dispute.'" *See Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (citations omitted). As such, judicial notice of the fact that a search warrant issued in *Pima County v. Ward*, No. SW18-000180-SW, A18-23382 (Pima Co. Justice Ct. July 26, 2018) is proper. Judicial notice of what was stated in the affidavit supporting the search warrant is also proper. The Court will not take judicial notice of the truth of those statements, merely that the attestations were made.

[4] Page citations refer to the CM/ECF page number for ease of reference.

ground) deemed to be in distress, in danger, or in violation of Pima County Municipal Code Title 6[,] [and] [a]ny physical evidence pertaining to violations of Pima County Municipal Code Title 6."[5] *Id.* at 7. PACC Investigator Sanders avowed as follows:

---

[5] The Pima County Municipal Code states in relevant part:

> A. Cruelty.
>
> > 1. Whoever:
> >
> > > a. Overdrives, overloads, overworks, tortures, torments, cruelly beats, mutilates or unlawfully kills an animal; or
> > >
> > > b. Causes or procures an animal to be so overdriven, overloaded, overworked, tortured, tormented, cruelly beaten, mutilated or killed; or
> > >
> > > c. Gives or administers anabolic steroids as defined in the united states code and the relevant sections of the Code of Federal Regulations, to any greyhound dog in training for or being used for racing within the state of Arizona, in order to artificially enhance performance or suppress estrus.
> >
> > Shall be guilty of a Class 1 misdemeanor.
> >
> > 2. Whoever, having charge or custody of an animal, either as owner or otherwise:
> >
> > > a. Inflicts unnecessary cruelty upon it, cruelly drives or works it when unfit for labor, or cruelly abandons it; or
> > >
> > > b. Carries it or causes it to be carried in or upon a vehicle or otherwise, in an unnecessarily cruel or inhumane manner; or
> > >
> > > c. Knowingly and willfully authorizes or permits it to be subjected to unreasonable or unnecessary torture, suffering or cruelty of any kind; or
> > >
> > > d. Gives or administers, or allows to be given or administered, anabolic steroids as defined in the United States Code and the relevant sections of the Code of Federal Regulations, to any greyhound dog in training for or being used for racing within the state of Arizona, in order to artificially enhance performance or suppress estrus.
> >
> > Shall be guilty of a Class 1 misdemeanor.
>
> B. Neglect. The purpose of this subsection is to guarantee that animals under human custody or control are housed in healthy environments and are provided with proper food, water, shelter, medical care, exercise space and ventilation. Any person owning or having care, control or custody of any animal shall provide:

- 4 -

[O]n 05/05/2018 Pima Animal Care Center (PACC) received a

> 1. That the animal receives daily, food that is free from contamination and is of sufficient quantity and nutritive value to maintain the animal in good health;
>
> 2. That potable water is accessible to the animal at all times, either free-flowing or in a clean receptacle;
>
> 3. That, except for livestock, all animals have convenient access to natural or artificial shelter throughout the year. Any such artificial shelter shall be structurally sound and maintained in good repair to protect the animal from injury and from the elements, and of sufficient size to permit the animal to enter, stand, turn around and lie down in a natural manner. Any shelter which does not protect the animal from temperature extremes or precipitation, or which does not provide adequate ventilation or drainage, shall not comply with this section. Any shelter, all bedding and any spaces accessible to the animal shall be maintained in a manner which minimizes the risk of the animal contracting disease, being injured, or becoming infested with parasites;
>
> 4. That the animal receives care and medical treatment for debilitating injuries, parasites and diseases, sufficient to maintain the animal in good health and minimize suffering;
>
> 5. That the animal is given adequate exercise space within an enclosure that shall be constructed of material, and in a manner, to minimize the risk of injury to the animal, and shall encompass sufficient usable space to keep the animal in good condition. With the exception of temporary tethering of horses, the use of tie-outs such as chains, leashes, wires, cables, ropes, or similar restraining devices for the purpose of animal confinement is hereby prohibited.
>
> 6. That the animal has access to adequate ventilation and is protected from temperature extremes at all times. In this connection, it is unlawful for any person to keep any animal in a vehicle or other enclosed space in which the temperature is either so high or so low, or the ventilation is so inadequate, as to endanger the animal's life or health. Any peace officer or Pima Animal Care officer is authorized to use whatever force is reasonable and necessary to remove any animal from a vehicle or other enclosed space whenever it appears that the animal's life or health is endangered by extreme temperatures or lack of ventilation within the vehicle or other enclosed space.
>
> No peace officer or Pima Animal Care officer shall be liable for damages to property caused by the use of reasonable force to remove an animal from such a vehicle or other enclosed space under such circumstances.

Pima County, Ariz. , Code § 6.04.110 (2013).

complaint stating . . . [Ms. Ward] has approximately 30 dogs and that they are allowed to urinate and defecate inside the trailer. The complainant requested a welfare inspection on living conditions of the animals.

\* \* \*

[O]n 05/16/2018[,] PACC Officer Long . . . arrived at . . . [Ms. Ward's residence] and was not able to make contact with the resident. Officer Long noted that she smelled what she believed to be animal waste coming from within the trailer.

\* \* \*

[O]n 06/06/2018[,] PACC received a call from . . . Ms. Ward to advise that she does not own 30 dogs. The resident advised an officer could see her property from outside the gate, and that she would not allow an inspection of her home.

\* \* \*

[O]n 06/08/2018[,] . . . Investigator Sanders . . . arrived at [Ms. Ward's neighbor] who advised . . . [t]hat [Ms. Ward] . . . owns approximately 30 dogs[,] . . . the animal waste has gotten out of control[,] [and] . . . all of the dogs reside inside a singlewide trailer[.]

\* \* \*

[O]n 06/08/2018[,] . . . [Investigator Sanders] made contact with Theresa Ward who was very reluctant to speak . . . [and] advised Theresa of the complaint and explained she is allowed to have as many dogs as she wants as long as she can properly care for them all. Theresa then stated . . . [t]hat she has only five dogs[,] . . . it is difficult for her to be in the sun and she did not feel it was a good time for [Investigator Sanders] to perform a welfare check[,] . . . she was concerned the dogs would injure [Investigator Sanders] if she allowed her to enter[,] [and] . . . [Investigator Sanders] could wait on the outside of her property gate and she would allow the dogs out front for [her] to observe. Theresa allowed [Investigator Sanders] to enter her gated property to see the shared fencing between her and a neighbor in order to address a fencing concern she had. While walking into the yard, [Investigator Sanders] walked past the front door area . . . and could smell what [was] believe[d] to be animal waste. [Investigator Sanders] could not determine its exact location due to Theresa refusing [] entry, however; it seemed to originate from in or underneath the mobile home. Upon leaving Theresa's property, the neighbor . . . approached and advised that Theresa was not honest about the amount of dogs she had and only showed me a few of them.

\* \* \*

[O]n 6/16/2018[,] [Investigator Sanders] received several emails with photos from the [neighbor] . . . showing at least nine large breed dogs living at [Theresa's residence].

\* \* \*

[O]n July 16, 2018, PACC Officer Long . . . responded to . . . [Ms. Ward's residence] and made contact with the dog owner[.] . . . Long asked Theresa how many dogs she had and requested to have entry to her home and perform a welfare check on the animal[s] inside and Theresa stated . . . [t]hat she only had five dogs[,] . . . her home was in a state of disrepair[,] . . . she has more than five dogs only after Officer Long informed her we had photos of at least nine dogs. Officer Long observed and documented that there was an odor emanating from the home of what she believed to be animal waste.

\* \* \*

[O]n July 18, 2018 Theresa contacted PACC and spoke with Sergeant Foster. Sergeant Foster advised of a complaint alleging strong odors of animal waste coming from her home and that officers and investigators have confirmed that the presence of strong urine and waste odors emanating from her home. Theresa vehemently denied this and stated that the odor was originating from the neighbor's pigpen. Sergeant Foster explained that APS officers and investigators are able to distinguish between the odors of pigs vs. dogs.

\* \* \*

[O]n 07/24/18 Officer Long arrived at . . . Ms. Ward's residence with Pima County Sheriff's Deputy Gonzalez[.] . . . Officer Long's observations and notations of her conversation with Theresa are as follows: . . . Upon arrival, Officer Long did not immediately smell animal waste emanating from the home[,] . . . when Theresa approached, there was a smell of animal waste emanating from her person[,] . . . Theresa stated . . . [t]hat her house was in a state of disrepair and stated that if the deputy were to enter her home, he may, "fall through the floor[,]" . . . [t]hat she had 5–6 dogs, but later advised that she had several other younger dogs on the property[,] . . . [and] she would let the Deputy in for "ten seconds" to see the living room, but that she would not allow anyone to see any other rooms in the home[.]

\* \* \*

When Theresa went back to the home, she let 5–6 large dogs out of the home into the yard. Three of the dogs began barking and lunging at the gate with hackles raised. Theresa stated that they would have to enter with the dogs unconfined in the yard. Both the Deputy and Officer Long felt

- 7 -

> uncomfortable entering with the dogs exhibiting the behavior they were displaying. Theresa stated that she would not confine the dogs and that we could come back with a warrant.
>
> Based on statements from neighbors and observations made by Officers, PACC believes the animals . . . may be subjected to unsanitary living conditions inside the home. PACC requests a search warrant . . . to conduct a welfare inspection on the animals contained therein. Pursuant to Pima County Municipal Code 6.04.130, PACC may impound any animals found to be in distress or in danger and issue a bond pending an order to show cause hearing.

*Id.* at 3–4.

### C. The Search

On July 26, 2018, several PCSD deputies and PACC officers arrived at Ms. Ward's home. FAC (Doc. 10) at ¶ 40. Among the PACC officers were Defendants Moore, Hinte, and Sanders. *Id.* The Deputies claimed they had a warrant to search the house, although they refused to show it to Ms. Ward. *Id.* at ¶¶ 41–42. Ms. Ward asked the deputies if they were at her house to search for excessive dog feces, and the deputies indicated that was the reason for the large police presence. *Id.* at ¶ 43. Ms. Ward was handcuffed and placed in one of the Deputy's cars for around two hours while the search was taking place. *Id.* at ¶ 47.

Ms. Ward alleges that "Defendants essentially tore [her] home apart looking for dog feces." FAC (Doc. 10) at ¶ 48. "During the search, Defendants damaged furniture, ripping apart chairs" and threw Ms. Ward's and her son's belongings—luggage, laundry, and mattress—all over the home. *Id.* at ¶¶ 50–51. No dog feces were found inside the residence. *Id.* at ¶ 52.

## II. STANDARD OF REVIEW

A complaint is to contain a "short and plain statement of the claim showing that the pleader is entitled to relief[.]" Rule 8(a), Fed. R. Civ. P. While Rule 8 does not demand detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct.

- 8 -

1937, 1949, 173 L.Ed.2d 868 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *Pareto v. Fed. Deposit Ins. Corp.*, 139 F.3d 696, 699 (9th Cir. 1998) ("conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss.").

Dismissal is appropriate where a plaintiff has failed to "state a claim upon which relief can be granted." Rule 12(b)(6), Fed. R. Civ. P. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*, 556 U.S. at 678, 129 S.Ct. at 1949 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007)). Further, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citations omitted).

"When ruling on a motion to dismiss, [the Court must] accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Association for Los Angeles Deputy Sheriffs v. County of Los Angeles*, 648 F.3d 986, 991 (9th Cir. 2011) (quoting *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005)). "The court draws all reasonable inferences in favor of the plaintiff." *Id.* (citing *Newcal Industries, Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008)). This Court is not required, however, to accept conclusory statements as a factual basis. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007); *Mann v. City of Tucson*, 782 F.2d 790, 793 (9th Cir. 1986) ("Although we must, in general, accept the facts alleged in the complaint as true, wholly vague and conclusory allegations are not sufficient to withstand a motion to dismiss.").

"As a general rule, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Lee v. City of Los Angeles*, 250 F.3d.

668, 688 (9th Cir. 2001) (quotations and citations omitted).  "There are, however, two exceptions to the requirement that consideration of extrinsic evidence converts a 12(b)(6) motion to a summary judgment motion.  *Id.*  "First, a court may consider material which is properly submitted as part of the complaint[.]"  *Id.*  Second, "[a] court may take judicial notice of 'matters of public record' without converting a motion to dismiss into a motion for summary judgment."  *Id.* at 689 (citing *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986)); *see also* Fed. R. Evid. 201.  Additionally, the Ninth Circuit Court of Appeals has "extended the 'incorporation by reference' doctrine to situations in which the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint."  *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

### III.   ANALYSIS

At oral argument Plaintiff's counsel asserted that the primary issue in this case is that the manner in which the search was conducted was unreasonable and excessive.  Secondarily, Plaintiff challenges the existence of probable cause for the warrant.

#### A.  *Reasonableness of Search*

"To assess the reasonableness of a search authorized by a warrant, we examine whether the degree of intrusion matched the underlying purpose of the intrusion."  *Denby v. Engstrom*, No. 20-16319, 2021 WL 2885846, at *2 (9th Cir. July 9, 2021) (citing *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 971 (9th Cir. 2005).  "[O]fficers executing a search warrant occasionally must damage property in order to perform their duty."  *Liston v. County of Riverside*, 120 F.3d 965, 979 (9th Cir. 1997) (internal quotation marks and citations omitted).  "Therefore, the destruction of property during a search does not necessarily violate the Fourth Amendment."  *Mena v. City of Simi Valley*, 226 F.3d 1031, 1041 (9th Cir. 2000) (citations omitted).  "Claims that

otherwise reasonable searches have been conducted in an unconstitutionally unreasonable manner must be judged under the facts and circumstances of each case." *United States v. Penn*, 647 F.2d 876, 883 (9th Cir. 1980) (citations omitted). "[O]nly unnecessarily destructive behavior, beyond that necessary to execute a warrant effectively, violates the Fourth Amendment." *Liston*, 120 F.3d at 979.

Here, Plaintiff alleges that PACC officers were only authorized to search for dog feces and argues that "when dog feces were not discovered in the most logical locations, Defendants began to search in places where dog feces would not conceivably been [sic] present." Pl.'s Response (Doc. 20) at 9. Plaintiff concludes that "[i]t was clearly unreasonable for Defendants to have damaged furniture and rip[ped] apart chairs in search of dog feces." *Id.* As an initial matter, Plaintiff's contention regarding the scope of the search warrant is without merit. The search warrant issued in this case was broad and authorized law enforcement to retain "[a]ny animals (living, dead, or unborn, both above and below ground) deemed to be in distress, in danger, or in violation of Pima County Municipal Code Title 6[,] [and] [a]ny physical evidence pertaining to violations of Pima County Municipal Code Title 6." Defs.' Mot. to Dismiss (Doc. 11), Exh. "1" at 7; *see also Pima County v. Ward*, No. SW18-000180-SW, A18-233882 (Pima Co. Justice Ct. July 26, 2018). Plaintiff's generalized allegations that officers damaged furniture and made a mess during the execution of the search warrant does not suggest that Defendant's behaved in a way that was "not reasonably necessary to execute [the] search warrant." *United States v. Becker*, 929 F.2d 442, 446 (9th Cir. 1991). Therefore, Plaintiff has failed to state a claim for relief.

### B. Probable Cause for a Search Warrant

"The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332,

76 L. Ed. 2d 527 (1983).  "And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for . . . conclud[ing] that probable cause existed." *Id.* at 238–39, 103 S. Ct. at 2332 (citations omitted) (alterations in original).  "To sustain the warrant here, there must be a sufficient relationship connecting the crime, the thing to be seized, and the place to be searched."  *United States v. Flores*, 679 F.2d 173, 175 (9th Cir. 1982).

At oral argument, Plaintiff urged that probable cause did not exist because Plaintiff was never issued a citation, and the warrant was sought based on circumstances that were known to be untrue.  The warrant affidavit, however, encompasses the factual scenario outlined in Plaintiff's Response (Doc. 20) and provides further details as to the events in question.  *See* Defs.' Mot. to Dismiss (Doc. 11), Exh. "1"; *see also Pima County v. Ward*, No. SW18-000180-SW, A18-233882 (Pima Co. Justice Ct. July 26, 2018); *cf* Pl.'s Response (Doc. 20) at 5–7.  Based on the observations of various PACC officers and investigators, as well as their interactions with Plaintiff and her statements to them, there was sufficient cause to believe that Plaintiff's home may contain evidence of animal neglect or cruelty.  The totality of the circumstances demonstrates that the magistrate judge had a substantial basis to conclude that probable cause existed to search Plaintiff's residence.  Plaintiff has failed to state a claim upon which relief could be granted.

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

**VI.   CONCLUSION**

Based upon the foregoing, IT IS HEREBY ORDERED that:

1) Defendants' Motion to Dismiss (Doc. 11) is GRANTED;

2) Plaintiff's Amended Complaint (Doc. 9) is DISMISSED WITH PREJUDICE; and

3) The Clerk of the Court shall close its file in this matter.

Dated this 30th day of September, 2021.

Honorable Bruce G. Macdonald
United States Magistrate Judge